UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

KYAN MULLINGS,

        Plaintiff,

                               **NOT FOR PUBLICATION**

    -against-

                               <u>**MEMORANDUM & ORDER**</u>

CAROLYN W. COLVIN, Acting Commissioner    13-CV-1705 (KAM)
of Social Security,

        Defendant.

-----------------------------------------X

**MATSUMOTO, United States District Judge:**

        Kyan Mullings ("plaintiff") appeals the final decision
of Acting Commissioner of Social Security Carolyn W. Colvin
("defendant" or the "Commissioner") denying plaintiff's
application for Social Security Disability ("SSD") under Title
II of the Social Security Act (the "Act"). Pursuant to Fed. R.
Civ. P. 12(c), the parties cross-moved for judgment on the
pleadings. (*See* ECF No. 20, Mem. of Law in Supp. of Pl.'s
Cross-Mot. dated 10/9/13 ("Pl. Mem."); ECF No. 18, Mem. of Law
in Supp. of Def.'s Mot. dated 8/26/13 ("Def. Mem.").) Plaintiff
claims that the Administrative Law Judge ("ALJ") in plaintiff's
disability hearing improperly weighed evidence from plaintiff's
treating physicians supporting plaintiff's claim of disability
and requests that the case be remanded solely for calculation of

benefits or, in the alternative, vacated and remanded for a *de novo* hearing. (Pl. Mem. at 1.) Defendant contends that the ALJ's decision was supported by substantial evidence. (*See generally* Def. Mem.) For the reasons set forth below, the case is remanded to the Commissioner for further proceedings consistent with this opinion.

**BACKGROUND**

## I. Plaintiff's Personal and Employment History

Plaintiff was born on October 4, 1979 in Brooklyn, New York. (Tr. 26.)[1] Plaintiff obtained a GED in 1998, and a commercial driver's license in 2003. (*Id.* at 141.) From February 2004 to August 2005, plaintiff performed clerical work processing taxes at two different companies. (*Id.* at 37, 142.) From September 2005 to February 2009, plaintiff worked as a van driver for various entities, including the Administration for Children's Services ("ACS").[2] (*Id.* at 38-39, 142.) On February 24, 2009, plaintiff was rear-ended while driving a van for work and subsequently stopped working as a result of the injuries he sustained from the accident. (*Id.* at 28, 140.) Plaintiff has not returned to work since the day of his accident.

---

[1] Citations to the administrative record (1-371) are indicated by the abbreviation "Tr."

[2] While on assignment for ACS, plaintiff transported children in a minivan and was often required to lift passengers, furniture, and other belongings. (Tr. 38-39, 66-67.)

## II. Plaintiff's Medical History

On February 25, 2009, the day after his accident, plaintiff was admitted to the Emergency Department of the Peninsula Medical Center complaining of shoulder, neck, and back pain. (Tr. 352-55.) A physical examination revealed that plaintiff experienced a reduced range of motion and tenderness in his neck and back. (*Id.*) The attending physician prescribed Motrin and Skelaxin and advised that plaintiff see a primary care physician within 48 to 72 hours. (*Id.*)

### A. Treating Relationship with Dr. McGee

On or about February 26, 2009, plaintiff saw Dr. John McGee for an initial examination. (*See id.* at 208.)[3] Plaintiff complained of neck and back pain and stiffness, dizziness, numbness in his fingers and toes, right shoulder pain, and shooting pain down his left leg and right arm. (*Id.*) He reported his pain was exacerbated by prolonged standing, walking, lying down, and carrying heavy objects. (*Id.* at 209.) Dr. McGee opined that plaintiff was in "moderate distress." (*Id.* at 210.)

In a physical examination, Dr. McGee observed that plaintiff's ranges of motion in the cervical and lumbosacral

---

[3] Although both the record and the parties' memoranda state the date of the initial examination as February 24, 2009, the date of plaintiff's accident (Tr. 208; Pl. Mem. at 4; Def. Mem. at 2), Dr. McGee's report indicates that he first saw plaintiff after plaintiff's February 25, 2009 visit to Peninsula Medical Center.

spine were lower than normal.[4] (*See id.* at 210.)  Dr. McGee

found that plaintiff's cervical muscles were symmetrical and

moderately tender.  (*Id.*)  A Spurling's test[5] was positive, as

was a straight leg raise test[6] in both legs.  (*Id.*)  Plaintiff

had pain and muscle spasm in his lumbar spine.  (*Id.*)  Although

plaintiff complained of pain in his right shoulder, his shoulder

ranges of motion were normal.  (*Id.* at 210-11.)

        Dr. McGee diagnosed plaintiff with a concussion,

spinal sprain/strain, radiculitis and disc displacement, and a

shoulder contusion, and noted that his prognosis for recovery

was "guarded."  (*Id.* at 212-13.)  Dr. McGee recommended an MRI,

referred plaintiff for physical therapy three times a week and

prescribed Percoset and Skelaxin for plaintiff's pain.  (*Id.* at

213.)  He noted that plaintiff was 100 percent temporarily

impaired and could not return to work due to pain.  (*Id.*)

---

[4] Specifically, plaintiff's cervical spine ranges of motion (in degrees) were:
flexion, 20 out of a normal 60; extension, 30 out of 50; left rotation, 20
out of 80; right rotation, 30 out of 80; left lateral flexion, 20 out of 45;
and right lateral flexion, 25 out of 45.  (*Id.* at 210.)  Plaintiff's lumbar
ranges of motion were: flexion, 45 out of a normal 90; extension, 20 out of
30; left rotation, 20 out of 45, right rotation, 25 out of 45, left lateral
flexion, 15 out of 35; and right lateral flexion, 10 out of 35.  (*Id.*)

[5] Physicians conduct a Spurling's test to assess nerve root compression and
cervical radiculopathy by turning the patient's head and applying downward
pressure.  A positive Spurling's sign indicates that the neck pain radiates
to the area of the body connected to the affected nerve.  *Spurling's Test*,
http://www.physio-pedia.com/Spurling's_Test (last visited Oct. 24, 2014).

[6] A straight-leg raise test may aid in determining whether a patient suffers
from lumbar disc herniation.  *Straight Leg Raise Test*, http://www.physio-
pedia.com/Straight_Leg_Raise_Test (last visited Oct. 24, 2014).  The SSA
regulations state that "[e]vidence of nerve root compression" may be
"characterized by . . . positive straight-leg raising test."  20 C.F.R. pt.
404, App. 1 to Subpart P, pt. B § 101.04.

Plaintiff underwent MRIs of his lumbar and cervical spine on April 27, 2009. (*Id.* at 206-207.) The MRI of the lumbar spine revealed a posterior disc bulge between the L5 and S1 vertebrae abutting the S1 nerve routes and the thecal sac. (*Id.* at 207.) The MRI of the cervical spine revealed cervical curvature straightening with kyphotic angulation at the C4/C5 vertebrae; disc bulging imposing on the thecal sac from C2/C3 through C6/C7; disc hydration loss at C3/C4, C4/C5, and C7/T1; right paracentral disc herniation at C5/6 abutting the right ventral cord; and disc herniation and a radial annular tear superimposed at C4/C5 that was imposing on the ventral margin of the cord in the midline. (*Id.* at 206.)

On August 6, 2009, plaintiff returned to Dr. McGee complaining of back pain and stiffness and shooting pain down his arms and legs.[7] (*Id.* at 191.) Plaintiff's cervical and lumbosacral ranges of motion were again less than normal and generally unchanged from his April examination. (*See id.* at 191.) However, plaintiff's right shoulder ranges of motion had decreased to: flexion, 120 degrees (out of 180 degrees); extension, 30 (out of 80); and adduction, 110 (out of 180). (*Id.* at 192.) His right shoulder strength measured a 3+ out of a possible 5. (*Id.*) Dr. McGee diagnosed plaintiff with spine

---

[7] As discussed below, plaintiff had received a steroid injection in his right shoulder from Dr. Eric Freeman on August 4, 2009. (*Id.* at 233; *see id.* at 191.)

sprain/strain and internal derangement of the right shoulder. (*Id.*)  Dr. McGee recommended an orthopedic consultation and physical therapy, and again opined that plaintiff was 100 percent temporarily impaired and could not return to work due to pain.  (*Id.* at 193-94.)

In his October 2009 examination, plaintiff again exhibited reduced spinal ranges of motion and pain in his cervical spine.  (*Id.* at 196.)  Both the Spurling's test and a straight leg raise test were positive.  (*Id.*)  Dr. McGee recommended an orthopedic follow up, pain management consultation and physical therapy, and prescribed Percocet (7.5 mg) for plaintiff's pain.  (*Id.* at 199.)  He noted that plaintiff was 50 percent temporarily impaired and opined that plaintiff could return to work with limitations on bending/twisting, climbing stairs, kneeling, lifting, operating heavy equipment, operation of motor vehicles and sitting.  (*Id.*)

At a November 2009 visit with Dr. McGee, plaintiff reported no change in his level of pain, although he complained of headaches, neck pain and numbness in his right leg in addition to the back pain and shooting pains down his legs and right arm reported at prior visits.  (*Id.* at 186.)  According to Dr. McGee's examination, plaintiff again exhibited reduced spinal ranges of motion with pain, and positive Spurling's and straight leg raising tests.  (*Id.*)  Dr. McGee recommended that

plaintiff medicate his pain with Tylenol/Aleve while awaiting a pain management consultation and opined that plaintiff was 100 percent temporarily impaired and could not return to work due to pain. (*Id.* at 186-89.) In December 2009, after plaintiff reported the same symptoms and pain levels, Dr. McGee recommended Percocet twice a day. (*Id.* at 204.)

During a January 2010 visit, plaintiff complained of worse pain. (*Id.* at 181.) Dr. McGee also noted that plaintiff was to receive an epidural injection. (*Id.*) Dr. McGee's examination revealed further reduced ranges of motion in plaintiff's lumbosacral spine, persisting reduced ranges of motion in his cervical spine and right shoulder and spine and shoulder pain. (*Id.* at 181-82.) Dr. McGee again diagnosed spinal sprain/strain and internal derangement of the right shoulder and prescribed 7.5 mg of Percocet. (*Id.* at 181-84.)

In May 2010, plaintiff complained of neck pain, arm numbness and tingling and back pain and stiffness with radiating pain down both legs. (*Id.* at 314.) Spinal ranges of motion were still lower than normal, and the Spurling's test and straight leg raise test were both positive. (*Id.* at 315.) Dr. McGee noted decreased sensation at the bilateral C5/C6/C7 and L5/S1 dermatomes. (*Id.*) Plaintiff's motor strength was 5/5 in the upper and lower extremities, and his reflexes were 2/5. (*Id.*) Dr. McGee diagnosed lumbar and cervical radiculitis and

lumbar disc displacement in addition to spinal sprain/strain and prescribed 10 mg of Ambien. (*Id.* at 317-18.) He again found that plaintiff was 100 percent temporarily impaired and unable to return to work due to pain. (*Id.* at 318.)

Plaintiff visited Dr. McGee again in June and July 2010 with the same complaints of pain, and Dr. McGee's physical examinations of plaintiff revealed no marked change. (*See id.* at 319-28.) In July, Dr. McGee noted that plaintiff had had three epidural injections in his lumbar spine but had not sought a second opinion regarding other recommended injections. (*Id.* at 319.) Dr. McGee discussed another pain doctor with plaintiff and again prescribed Ambien. (*Id.* at 322-23.) In September 2010, Dr. McGee noted that plaintiff's pain was persisting and that he had seen Dr. Dov Berkowitz, M.D.,[8] and Dr. Sebastian Lattuga, M.D., a spine specialist. (*Id.* at 338.) In November 2010, Dr. McGee noted that plaintiff was to undergo surgery on his lower back with Dr. Lattuga. (*Id.* at 330.) Dr. McGee prescribed 12.5 mg of Ambien CR, an extended-release formula of the drug. (*Id.* at 334.) In January 2011, Dr. McGee noted that

---

[8] On August 23, 2010, Plaintiff saw Dr. Berkowitz, who recommended that plaintiff follow up with spine specialist Dr. Sebastian Lattuga. (*Id.* at 356.) Dr. Berkowitz observed plaintiff could forward flex his lumbar spine about 60 degrees and extend to neutral with some paraspinal tenderness. (*Id.*) He noted that plaintiff's pain was "significant" and getting worse over time, and that plaintiff had not made progress with conservative treatment. (*Id.*)

plaintiff's pain continued to persist with no change and that plaintiff would undergo another cervical MRI. (*Id.* at 335.)

B. Treating Relationship with Dr. Freeman

On August 4, 2009, plaintiff saw Dr. Eric Freeman for an orthopedic consultation, after a referral from Dr. Andrew Susi, plaintiff's chiropractor. (*See id.* at 32, 232.) Dr. Freeman's examination of plaintiff's right shoulder demonstrated a positive drop-arm test, positive Neer's and Hawkins tests, and bicipital groove tenderness, but no instability. (*Id.*) His examination of plaintiff's left shoulder revealed pain in the bicipital groove, a negative drop-arm test, and positive Neer's and Hawkins tests. (*Id.*) Dr. Freeman observed restriction of motion in plaintiff's lumbar spine, with pain and spasms present, and a straight leg raise test was positive. (*Id.*) Plaintiff also had restricted motion in his cervical spine, and a Spurling's test was positive. (*Id.*) Dr. Freeman noted that plaintiff was neurologically intact. (*Id.*)

Based on x-rays and his physical examination of plaintiff, Dr. Freeman concluded that plaintiff had disc disease in his cervical and lumbar spine and possible derangement of both shoulders (the right greater than the left). (*Id.* at 233.) He recommended a right shoulder MRI to check for a potential labral tear and administered a corticosteroid injection into plaintiff's right shoulder. (*Id.*) He opined that plaintiff was

"currently disabled" and advised that plaintiff would proceed with physiotherapy for his shoulders, neck and back. (*Id.* at 233.)

During an August 18, 2009 follow up evaluation, Dr. Freeman noted that plaintiff's cervical and lumbar spine were unchanged and that plaintiff continued to experience pain. (*Id.* at 231.) Additionally, plaintiff's right shoulder still had pain with rotary motion and the left shoulder was unchanged. (*Id.*) Because Dr. Freeman had not received authorization for an MRI, he recommended that plaintiff continue with his current physical therapy until his next appointment, and again noted that plaintiff was currently disabled "with regards [*sic*] to work." (*Id.*) Plaintiff returned to Dr. Freeman's office after an MRI, at which time Dr. Freeman noted that, with regard to plaintiff's right shoulder, plaintiff displayed abduction and forward flexion to 170 degrees, internal rotation to L2, and external rotation with his elbow at his side to 35 degrees. (*Id.* at 230.) Signs of right shoulder impingement and bicipital tension were present, and plaintiff's drop-arm test was positive. (*Id.*)

During a follow-up visit on October 8, 2009, Dr. Freeman examined plaintiff and plaintiff's MRI results.[9] (*Id.* at 229.) Dr. Freeman observed than plaintiff's right-shoulder abduction and forward flexion, internal rotation and external rotation were unchanged. (*Id.*) Impingement signs and a drop-arm test were again positive. Dr. Freeman noted that the MRI indicated impingement without any rotator cuff tear. (*Id.*) He recommended that plaintiff refrain from working and requested authorization to begin physical therapy on plaintiff's right shoulder. (*Id.*) Dr. Freeman prescribed physiotherapy with the goal of non-operative pain management. (*Id.*)

After a scheduled follow-up on October 29, 2009, Dr. Freeman found that plaintiff's shoulder was unchanged and that plaintiff experienced ongoing, consistent radicular-type discomfort in the neck and back. (*Id.* at 228.) Dr. Freeman recommended that plaintiff follow up with Dr. Freeman's spine partner, Dr. Aron Rovner, to consider epidural injections for plaintiff's lumbar spine, after which Dr. Freeman would continue work on plaintiff's back and shoulder. (*Id.*) Dr. Freeman requested authorization for a series of three epidural injections. (*Id.*)

---

[9] Plaintiff had an MRI of his right shoulder on September 16, 2009 at St. John's Episcopal Hospital South Shore. (*Id.* at 236.) Dr. Joseph Izzo reported that plaintiff displayed mild tendinopathy, but found no tendon discontinuity, retraction or skeletal muscle atrophy. (*Id.*)

Dr. Freeman observed during a follow-up on November 19, 2009 that plaintiff's right shoulder, neck and back were unchanged in terms of range of motion, and that plaintiff continued to experience radicular pain in the neck and back. (*Id.* at 227.)  Dr. Freeman opined that plaintiff was currently disabled and noted that he had not yet received authorization for the epidural injections.  (*Id.*)

On December 17, 2009, plaintiff returned to Dr. Freeman for an evaluation of plaintiff's lumbar spine herniated disc.  (*Id.* at 226.)  Dr. Freeman noted that plaintiff's right shoulder and neck were unchanged and plaintiff would follow up with Dr. Rovner now that authorization had been received for the spinal injections.  (*Id.*)  Dr. Freeman also renewed plaintiff's prescription for Vicodin.  (*Id.*)

C. <u>Treating Relationship with Dr. Rovner</u>

Records of Dr. Rovner's examinations of plaintiff begin on January 5, 2010, when Dr. Rovner reported that plaintiff returned for a follow-up visit complaining of back pain radiating down both legs to his feet and toes, and neck pain radiating down his right arm with numbness and paresthesia extending to his fingers.  (*Id.* at 223.)  Dr. Rovner observed that plaintiff had limited range of motion of the cervical and lumbar spine (0 to 50 degrees) and cervical and lumbar spine spasm.  (*Id.*)  Plaintiff had positive Spurling's and straight-

leg raise tests. (*Id.*) Dr. Rovner observed that plaintiff's cervical spine MRI showed disc bulging and herniation primarily at the C3-4, C4-5 and C5-6 levels, and that plaintiff's lumbar spine MRI showed disc bulging and neurological impingement primarily at the L4-5 level. (*Id.*) Dr. Rovner noted that plaintiff would undergo a series of three epidural steroid injections, which they discussed at length. (*Id.*) Dr. Rovner also requested approval for an EMG test (electromyogram) of plaintiff's bilateral upper and lower extremities. (*Id.* at 224.)

Plaintiff received three lumbar epidural steroid injections to treat lumbar thoracic radiculitis on January 21, January 28 and February 4, 2010. (*Id.* at 234, 297-98). Following the epidural injections, plaintiff visited Dr. Rovner on February 16, 2010, complaining of persistent neck pain radiating down his right arm and fingers, and back pain radiating down the posterolateral aspect of the knees of both legs. (*Id.* at 222.) Dr. Rovner observed that plaintiff had limited range of motion of the cervical and lumbar spine, a positive Spurling's sign, and a positive straight-leg raise test. (*Id.*) Dr. Rovner recommended three cervical epidural steroid injections and an EMG test of plaintiff's bilateral upper and lower extremities. (*Id.*)

Plaintiff received an epidural steroid injection to treat lumbar HNP (herniated nucleus pulposus, also referred to as a herniated disc) on February 25, 2010. (*Id.* at 278.) Plaintiff received another series of epidural steroid injections to treat lumbar thoracic radiculitis on March 4, March 25 and April 8, 2010. (*Id.* at 256-64.)

On April 1, 2010, plaintiff underwent another MRI of the lumbar spine. (*Id.* at 312.) In the report to Dr. Rovner, Dr. Steven Winter noted that the findings were "not significantly changed" from the results of plaintiff's MRI on April 27, 2009. (*Id.*) Plaintiff displayed left convexity of the lumbar curvature, a posterior disc bulge at L5/S1 abutting the S1 nerve roots after they exit the thecal sac and subligamentous disc bulges at L2/3 and L4/5. (*Id.*) The MRI revealed no other remarkable abnormalities. (*Id.*)

On July 5, 2010, prior to plaintiff's administrative hearing, Dr. Rovner completed a medical assessment of plaintiff's ability to do work-related activities. (*See id*. at 308-09.) Dr. Rovner reported that plaintiff's impairment affected his ability to lift and carry to the extent that plaintiff could not lift or carry any weight. (*Id.* at 309.) He based this conclusion on medical findings of cervical neck pain and lumbar radiculopathy, and plaintiff's symptoms of persistent

neck and back pain radiating down both legs with numbness and paresthesia down both posterolateral aspects. (*Id.*)

Dr. Rovner reported that plaintiff's impairment also affected his ability to stand and walk such that plaintiff could only stand or walk for one to two hours total and 30 minutes without interruption in an eight-hour workday. (*Id.*) Dr. Rovner cited plaintiff's cervical and lumbar radiculopathy, persistent neck and back pain, limited range of motion, positive Spurling's sign and positive straight-leg raise test as medical findings that supported his conclusion, in addition to plaintiff's symptoms of radiating pain and numbness. (*Id.* at 309-10.)

Dr. Rovner concluded that plaintiff's impairment similarly affected his ability to sit to the extent that plaintiff could sit for one to three hours total and 30 – 45 minutes without interruption in an eight-hour workday. (*Id.* at 310.) He cited plaintiff's radiating leg pain due to lumbar radiculopathy to support this conclusion. (*Id.*)

Dr. Rovner concluded that plaintiff could never climb, stoop, kneel, balance, crouch or crawl due to his spinal radiculopathy, and noted that plaintiff had undergone a series of epidural steroid injections. (*Id.*) He also reported that plaintiff's ability to reach, handle, push and pull would be

affected due to pain and cervical and lumbar spine radiculopathy. (*Id.* at 311.)

On July 20, 2010, plaintiff visited Dr. Rovner for a follow-up evaluation and complained of persistent back pain but no radiating leg pain. (*Id.* at 313.) Dr. Rovner's examination revealed no other change in plaintiff's physical condition. (*Id.*) Dr. Rovner noted that plaintiff did not yet want to undergo facet joint injections. (*Id.*)

D. Treating Relationship with Dr. Lattuga

Dr. Lattuga saw plaintiff for a spinal consultation on September 9, 2010. (*See id.* at 343-45.) At the time, plaintiff continued to complain of neck and back pain and upper and lower extremity radiation with numbness and tingling; he also described his pain as daily, constant, persistent and measuring 8-9 out of 10. (*Id.* at 343.) Dr. Lattuga conducted a spine exam that indicated tenderness, restricted ranges of motion and spasms in the cervical and thoracolumbar spine. (*Id.* at 343-44.) The examination revealed that plaintiff had normal coordination and normal gait, but abnormal motor strength and decreased sensation in the C6, C7, L5 and S1 bilateral nerve root distributions. (*Id.* at 344.) Dr. Lattuga reviewed plaintiff's April 29, 2009 and April 1, 2010 MRIs and diagnosed cervical and lumbar spine sprain, radiculopathy and HNP. (*Id.*) Dr. Lattuga reported that he discussed with plaintiff various

surgical and non-surgical treatment options, including physical
therapy, epidural steroid injections and medication, and that
plaintiff chose to proceed with conservative treatment to
include physical therapy. (*Id.* at 344-45.) Dr. Lattuga
reported that plaintiff was to consider anterior cervical
discectomy (a surgical procedure) and noted that plaintiff was
to refrain from heavy lifting, carrying and bending. (*Id.*)

Dr. Lattuga saw plaintiff for a follow up visit on
October 28, 2010 and requested approval for physical therapy and
a discogram.[10] (*Id.* at 346-48.) Plaintiff next visited Dr.
Lattuga on January 4, 2011 and indicated a desire to undergo
anterior cervical discectomy and fusion. (*Id.* at 349-51.) Dr.
Lattuga requested approval for physical therapy and a cervical
MRI.[11] (*Id.* at 351.)

On May 11, 2011, Dr. Lattuga performed an anterior
cervical discectomy and fusion on plaintiff at North Shore-Long
Island Jewish Franklin Hospital. (*See id.* at 358-60.) In a
post-operative evaluation dated August 18, 2011, Dr. Lattuga
reported that plaintiff complained of pain, mild hoarseness and
some symptoms consistent with his condition before he had

---

[10] The discogram was conducted on February 15, 2011 by Dr. Norman Schoenberg
at Spine & Joint Services. (*Id.* at 362-64.) He reported that the CT exam
demonstrated good alignment, that there was no evidence for osteoporosis,
fracture, or metastatic disease, and that the lumbar discs injected were
largely intact other than minor annular tears. (*Id.* at 363-64.)

[11] The MRI, discussed below, was conducted by Dr. Steven Ham at Doshi
Diagnostic Imaging Services on January 26, 2011. (*Id.* at 357.)

undergone surgery. (*Id.* at 370-71.) Dr. Lattuga observed that plaintiff was doing well and that his neck pain had improved, but that plaintiff still had residual pain in his lower back and lower extremities at a level of 8 out of 10. (*Id.* at 370.) Plaintiff's pain increased with lifting, carrying, bending, sitting and standing for long periods. (*Id.*) Dr. Lattuga's examination revealed that plaintiff suffered tenderness, spasms and restricted ranges of motion[12] in the cervical and lumbar spine. (*Id.*) Plaintiff had normal coordination and his motor strength, sensation and reflexes were unchanged from his pre-operative condition. (*Id.*) Dr. Lattuga noted that plaintiff was to begin physical therapy and pain management. (*Id.* at 371.) He recommended that plaintiff refrain from activities such as lifting, carrying, bending and twisting, which would exacerbate his pain symptoms. (*Id.*)

E. Consultative Examination by Dr. Teli

On or about March 18, 2010, Dr. Iqbal Teli performed internal medicine and physical examinations of plaintiff at the request of the Division of Disability Determination. (*Id.* at 241-44.) Dr. Teli noted that plaintiff's chief complaint was of a sharp, intense and continuous low back pain that (1) radiated to the lower extremities bilaterally with numbness, (2)

---

[12] Specifically, plaintiff displayed the following ranges of motion: flexion, 15 degrees (70 degrees is normal); extension, 5 degrees (45 is normal); left and right turning, 20 degrees (60 is normal).

increased when walking and (3) decreased when lying down or taking medication. (*Id.* at 241.) Plaintiff also complained of a daily, throbbing pain in the right shoulder that increased with raising the right arm, decreased with medication and radiated to the right arm with numbness in the right fingers. (*Id.*) Dr. Teli noted that plaintiff was currently taking hydrocodone/acetaminophen (5/500 mg) for pain. (*Id.*)

Upon physical examination, Dr. Teli noted that plaintiff was in no acute distress and had a normal gait and stance, but felt unstable when walking on his heels. (*Id.* at 242.) Plaintiff could complete only a half-squat due to back pain. (*Id.*) Plaintiff was able to change for the exam, rise from his chair without difficulty and get on and off the exam table without assistive devices. (*Id.*) Dr. Teli reported that plaintiff's cervical and lumbar spine displayed full flexion, extension, lateral flexion bilaterally and rotary movement bilaterally. (*Id.* at 243.) Plaintiff's straight-leg raise test while supine was positive on both the right side (at 40 degrees) and the left side (at 50 degrees). (*Id.*) Plaintiff's straight-leg raise test while sitting was negative bilaterally. (*Id.*) Plaintiff's right shoulder forward elevation and abduction were both 90 degrees, and the right side elbow flexion was 100 degrees. (*Id.*) Grip strength on the right side was 4/5. Measurements of the left shoulder elevation and abduction, left

side elbow flexion, and left side grip strength were normal. (*Id.*) Plaintiff displayed full range of motion of the forearms, wrists, hips, knees and ankles, with full strength in upper and lower extremities. (*Id.*)

Overall, Dr. Teli gave a prognosis of fair and opined that plaintiff had a mild restriction for squatting, overhead activity and lifting and carrying with the right arm. (*Id.* at 244.)

F. Testimony from Plaintiff

In an application to the Division of Disability Determinations of the New York State Office of Temporary and Disability Assistance dated February 10, 2010, plaintiff reported that his daily activities included taking short walks at least once a day, feeding a neighbor's dog, reading and watching television. (*Id.* at 150-55.) He stated that he no longer shopped, prepared his own meals, exercised or engaged in social activities. (*Id.*) At the administrative hearing on March 15, 2011, plaintiff reaffirmed that he did not cook, shop, clean, visit friends or relatives, drive or take the subway due to discomfort, and sometimes had trouble dressing himself. (*Id.* at 43-47.) His girlfriend and her children, with whom he currently lives, assist him with daily living tasks. (*Id.*)

At the hearing on March 15, 2011, plaintiff stated that his daily activities included taking short walks every

other day for about ten minutes. (*Id.* at 47.) He reported that he was able to walk about half a block before feeling pain in his hips and knees, at which point he would stop and rest for 10 to 15 minutes. (*Id.* at 40-41.) Plaintiff said that he could not kneel or bend because of pain, and had trouble sitting for more than 10 or 15 minutes due to neck and back pain and numbness in his legs. (*Id.* at 41-42.) He reported being unable to stand on his feet for more than 15 to 20 minutes before feeling pain. (*Id.*) Plaintiff also stated that he was able to lift objects up to five points, although he was unable to grip or hold objects for long, including writing implements, without soreness and pain. (*Id.* at 42-43.)

As indicated by his treatment history and hearing testimony, plaintiff has undergone various pain treatment methods. In addition to receiving multiple epidural injections and undergoing spinal surgery in May 2011 (*see id.* at 359-60), plaintiff took medication at various points to manage his pain symptoms. In January 2010, plaintiff reported using oxycodone/APAP (the generic equivalent of Percocet) for pain, as prescribed by Dr. McGee. (*Id.* at 143.) In February 2010, plaintiff reported taking acetaminophen—codeine #3 every four hours as needed, though it did not relieve his pain for a long time. (*Id.* at 158.) In April 2010, plaintiff reported taking

Percocet and Relafen for pain, as prescribed by Dr. Rovner. (*Id.* at 163.)

At the time of the hearing, plaintiff reported that he was not currently on pain medication because his treating physician, Dr. McGee, did not want plaintiff to develop an addiction; instead, plaintiff was taking Ambien to help him sleep. (*Id.* at 28, 30, 36.) Plaintiff also complained of daily persistent headaches, for which he took Excedrin. (*Id.* at 49-50.) Plaintiff reported using a TENS unit[13] for his pain two to three times a day for 20 minutes at a time. (*Id.* at 28, 30.) He also said that he had been seeing a chiropractor, Dr. Susi, for the past two years, two to three times a week, for neck and back adjustments, which would relieve pressure for about half an hour. (*Id.* at 31-32.)

## III. Procedural History

An application was previously filed with the Social Security Administration ("SSA") on plaintiff's behalf when plaintiff was a minor. (*Id.* at 168.) The claim was denied after a March 1995 hearing, but the basis of the decision is unclear from the record. (*Id.*) Plaintiff applied for SSD benefits on January 28, 2010, alleging disability since February 24, 2009. (*Id.* at 130.) The Regional Commissioner denied

---

[13] A transcutaneous electrical nerve stimulation (TENS) applies an electric current to nerves via the skin in order to relieve pain. WebMD, *TENS for Back Pain*, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited Oct. 24, 2014).

plaintiff's claim on March 25, 2010, citing plaintiff's ability to "perform light work." (*Id.* at 78-81.) On April 22, 2010, plaintiff requested an administrative hearing to review the SSA's decision. (*Id.* at 86.) The hearing took place on March 15, 2011 with ALJ Sol Wieselthier presiding. (*See generally id.* at 21-52.) Plaintiff, represented by counsel, appeared and testified. (*Id.* at 23, 25-52.)

During the hearing, Dr. Louis Lombardi, a state medical examiner who had not examined plaintiff, gave his opinion on the medical evidence in the administrative record. (*Id.* at 53-71.) In addition, the ALJ heard testimony from Andrew Kozinik, a vocational expert. (*See id.* at 62-69.) At the conclusion of the hearing, the ALJ agreed to hold the administrative record open for an additional week for plaintiff to submit an update from Dr. Lattuga. (*Id.* at 71.)

After the hearing, plaintiff sent three additional exhibits to the ALJ, which were forwarded to Dr. Lombardi. (*See id.* at 365.) The first exhibit was a report from Doshi Diagnostic analyzing an MRI of plaintiff's cervical spine, which describes straightening of the normal cervical lordosis, a small right paracentral disc herniation at the C5/C6 disc space and diffuse disc bulge at the C3/C4, C4/C5 and C6/C7 disc spaces. (*Id.* at 357.) Plaintiff also submitted documents from Dr. Lattuga regarding plaintiff's then-upcoming surgery. (*Id.* at

358-61.)  The third exhibit contained results from a discogram,
lumbosacral spine radiographic series and CT/discogram of the
lumbosacral spine, which revealed that plaintiff had (1) minor
inner annular tears of the lumbar discs injected, though the
discograms of the L3-4, L4-5 and L5-S1 discs were negative, and
(2) minimal osteoarthritis of the L3-4 through L5-S1 facet
joints.  (*Id.* at 362-64.)  Accompanying the new exhibits was a
form letter for Dr. Lombardi's completion, which was returned,
unsigned and undated, with a checkmark indicating that Dr.
Lombardi would not change his testimony in light of the
additional evidence provided.  (*Id.* at 367.)

In a decision dated July 13, 2011, the ALJ denied
plaintiff's claim of disability.  (*Id.* at 11, 17.)  According to
the insurance coverage requirements of the Act, plaintiff would
have to establish disability on or before December 31, 2013.
(*Id.* at 11.)  Using the five-step evaluation process disability
determination provided in 20 CFR § 404.1520(a), the ALJ held
that plaintiff did not establish a disability within the meaning
of the Act through the date of his decision.  (*Id.* at 11.)

Under the first step, the ALJ found that plaintiff had
not engaged in "substantial gainful activity" since the date of
his accident.  (*Id.* at 13.)  Under the second step, the ALJ
found that plaintiff had "severe" impairments within the meaning
of the regulations.  (*Id.*)  Under the third step, the ALJ found

that plaintiff's impairments failed to meet or medically equal
the criteria of an impairment listed in 20 CFR §§ 404.1520(d),
404.1525 and 404.1526. (*Id.* at 14.) Specifically, the evidence
did not show nerve root compression, an inability to perform
gross and fine movements or an inability to ambulate
effectively. (*Id.*) Proceeding to the fourth step, the ALJ
determined that plaintiff had the residual functional capacity
to perform "the full range of light work as defined in 20 CFR
404.1567(b): lifting and carrying twenty pounds occasionally and
ten pounds frequently; standing, walking and sitting six hours
out of an eight-hour workday." (*Id.*) Although the ALJ found
that plaintiff's impairments could reasonably be expected to
cause the symptoms he experienced, he determined that
plaintiff's statements regarding the "intensity, persistence,
and limiting effects" of those symptoms were not credible to the
extent that they conflicted with medical evidence in the record.
(*Id.* at 15-16.) The ALJ concluded that plaintiff had the
residual functional capacity ("RFC") to perform clerical work
and met the duration, recency and earnings requirements for the
capacity to engage in "substantial gainful activity." (*Id.* at
16-17.)

Plaintiff timely submitted a request for review by the
Appeals Council. (*Id.* at 125-29.) While the request for review
was pending, plaintiff submitted a post-operative evaluation

from Dr. Lattuga demonstrating that plaintiff underwent anterior cervical disc fusion surgery on May 19, 2011. (*Id.* at 368-71.) The Appeals Council denied review on January 28, 2013, rendering the ALJ's decision the final administrative decision on plaintiff's application for disability benefits. (*Id.* at 1-3.)

Plaintiff appealed the ALJ's decision to this court on March 29, 2013. Defendant moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) affirming that the ALJ's decision was legally sufficient and supported by substantial evidence. (Def. Mem. at 1.) Plaintiff cross-moved for judgment on the pleadings vacating the ALJ's decision, arguing that the ALJ committed legal error by failing to properly consider medical evidence from plaintiff's treating physicians. (Pl. Mem. at 1.)

## DISCUSSION

### I.   Standard of Review

The reviewing court does not engage in a *de novo* determination of whether the plaintiff is disabled. *Parker v. Harris*, 626 F.2d 225, 232 (2d Cir. 1980). Instead, the reviewing court assesses (i) whether proper legal standards for disability determination were applied, and (ii) whether substantial evidence supports the findings of fact. *Id.; Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984). If the Commissioner's decision applies the correct legal standards and

is supported by substantial evidence, the decision must stand. *See Grace v. Astrue*, No. 11 Civ. 9162, 2013 WL 4010271, at *12 (S.D.N.Y. July 31, 2013).

In order to assess the legal standards and evidentiary support used by the ALJ in his disability finding, the reviewing court must be certain that the ALJ considered all the evidence. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004); *see Carnevale v. Gardner*, 393 F.2d 889, 891 (2d Cir. 1968) ("We cannot fulfill the duty entrusted to us, that of determining whether the Hearing Examiner's decision is in accordance with the Act, if we cannot be sure that he considered some of the more important evidence presented[.]").

When reviewing decisions of the SSA, the district court is authorized to order additional proceedings. *See* 42 U.S.C. § 405(g) ("[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing"). Remand is appropriate to allow the ALJ to further develop the record, make more specific findings, or clarify his or her rationale. *See Grace v. Astrue*, 2013 WL 4010271, at *14; *see also Butts v. Barnhart*, 399 F.3d 277, 385-86 (2d Cir. 2004). When the reviewing court has "no apparent basis to conclude that a more complete record might support the

Commissioner's decision," it may remand for the sole purpose of calculating benefits.  *Butts*, 399 F.3d at 385-86.

A. <u>Legal Standards Governing Agency Determinations of Disability</u>

1. <u>The Commissioner's Five-Step Analysis</u>

The Social Security Act defines disability as a claimant's "inability to engage in any substantial gainful activity by reasons of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  Furthermore, a claimant is disabled under the Act only if "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. § 423(d)(2)(A).  The Commissioner "shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity" in determining eligibility for benefits.  42 U.S.C. § 423(d)(2)(B).

Under SSA regulations, the Commissioner must proceed through a five-step analysis to determine whether a claimant is disabled.  The claimant bears the burden of proving "(1) that

the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work[.]" *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnart*, 311 F.3d 468, 472 (2d Cir. 2002)) (internal quotations omitted). In the fourth step, the Commissioner assesses the claimant's RFC, defined as "the most the claimant can still do in a work setting despite the limitations imposed by his impairments." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing 20 C.F.R. § 404.1545). If the claimant carries his burden through the first four steps, then the Commissioner must find him disabled if "(5) there is not another type of work the claimant can do," as determined by the SSA. *Green-Younger*, 335 F.3d at 106 (internal quotations omitted).

## 2. The Treating Physician Rule

In determining whether a claimant is disabled, the Commissioner considers all medical opinions received "together with the rest of the relevant evidence." 20 C.F.R. § 404.1527(b). The SSA regulations also codified the "treating physician rule," which dictates that the Commissioner must give "controlling weight" to a treating source's opinion "on the issue(s) of the nature and severity" of a claimant's impairments

as long as the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993). In general, such deference to treating physicians is warranted because treating sources are "most able to provide a detailed, longitudinal picture . . . and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

When the Commissioner declines to give controlling weight to a treating source's opinion, the regulations require that he or she must "always give good reasons" for the amount of weight given. *Id.; see Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (remand is appropriate where the ALJ has not comprehensively set forth good reasons for the weight accorded to treating physicians). The Commissioner will decide the weight of each opinion according to the frequency of examination; the length, nature and extent of the treatment relationship; and the supportability, consistency and specialization of the opinion, along with other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). The

Commissioner can use these factors in providing "good reasons" for declining to give controlling weight to treating physicians. Failure to provide "good reasons" is grounds for a remand. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (finding legal error when the ALJ failed to consider all of the factors in the SSA regulations); *see also Halloran*, 362 F.3d at 33.

### 3. The ALJ's Affirmative Duty to Develop the Record

According to the SSA regulations, the Commissioner must "make every reasonable effort" to assist the claimant in developing a "complete medical history." 20 C.F.R. § 404.1512(d). Furthermore, "[i]t is the rule in our circuit that the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding. This duty . . . exists even when, as here, the claimant is represented by counsel." *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996) (internal citations and quotations omitted). Thus, if the claimant's medical record is inadequate, it is "the ALJ's duty to seek additional information from the [treating physician] *sua sponte*." *Schaal*, 134 F.3d at 505; *see Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").

The ALJ's affirmative duty comports with this Circuit's observation that "the Social Security Act is remedial or beneficent in purpose, and, therefore, to be broadly construed and liberally applied." *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (internal quotations omitted). The Act's "intent is inclusion rather than exclusion." *Marcus v. Califano*, 615 F.2d 23, 29 (2d Cir. 1979).

### 4. Admissibility of Medical Evidence

The regulations provide that "[a]ll consultative examination reports will be personally reviewed and signed by the medical source who actually performed the examination. This attests to the fact that the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided[.]" 20 C.F.R. §§ 404.1519n(e), 416.919n(e).

Some districts have recognized that a follow-up response from a consultative examining physician constitutes a report for purposes of the requirement. *See, e.g.*, *Scott v. Shalala*, 898 F. Supp. 1238, 1251 (N.D. Ill. 1995). However, this requirement by its terms applies only to the reports of examining sources; non-examining sources face no similar signature requirement. *Genovese v. Astrue*, No. 11–CV–02054, 2012 WL 4960355, at *19 (E.D.N.Y. Oct. 27, 2012) (citing *Lackner v. Astrue*, No. 09–CV–00895, 2011 WL 2470496, at *7 (N.D.N.Y. May

32

26, 2011), *report and recommendation adopted*, 2011 WL 2457852 (N.D.N.Y. Jun. 20, 2011)).

## B. Substantial Evidence Standard

If "substantial evidence, considering the record as a whole" supports the Commissioner's determination of disability, the "conclusion must be upheld." *See McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014); 42 U.S.C. § 405(g); *see Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) ("[A]n analysis of the substantiality of the evidence must also include that which detracts from its weight."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971) (internal quotation marks omitted).

## II. Application

### A. The ALJ Erred by Failing to Explain the Weight Accorded to Treating Physicians' Opinions

Plaintiff argues that the ALJ's failure to give controlling weight to opinions from plaintiff's treating physicians, particularly Dr. Rovner, requires a remand. (Pl. Mem. at 23-28.) Defendant responds that the ALJ properly weighed the medical opinions by instead giving controlling weight to the opinions of the consultative examiner and non-examining medical expert. (Def. Reply at 2.) For the reasons

discussed below, the court finds that the ALJ's failure to give "good reasons" for the weight he accorded to the opinions of Dr. Rovner and plaintiff's other treating physicians warrants remand.

The weight accorded to medical evidence, including the opinions of examining sources, is within the discretion of the ALJ.  Although the regulations describe a general expectation that the opinions of treating physicians—in particular those whose treating relationships afford a longitudinal perspective on plaintiff's impairments—will receive controlling weight in the ALJ's determination of disability under the Act, the ALJ may decline to accord controlling weight if the treating physicians' opinions are contradicted by other substantial evidence in the record.  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  In that case, the ALJ is to consider all the medical evidence together and factors including the frequency of examination; the length, nature and extent of the treatment relationship; and the supportability, consistency and specialization of the opinion to determine the appropriate weight to give to the treating source's opinion.  20 C.F.R. §§ 404.1527(b)-(c).

When the ALJ declines to accord controlling weight to a treating source's opinion, he must give "good reasons" for his decision.  20 C.F.R. § 404.1527(c)(2).  Specifically, the ALJ must articulate his reasoning with regard to the above factors,

but he failed to do so in the instant action. *See Schaal*, 134
F.3d at 503-505 (finding legal error in ALJ's decision due to
failure to consider all of the factors in the SSA regulations);
*Hanes v. Comm'r of Soc. Sec.*, No. 11-CV-1991, 2012 WL 4060759,
at *15 (E.D.N.Y. Sept. 14, 2012) (remanding when the ALJ gave
greater weight to a consultative physician's opinion than a
treating physician's opinion without indication that the ALJ
considered, *inter alia*, the frequency of examination and length,
nature and extent of the treatment relationship; the evidence in
support of the opinion; whether the opinion is from a
specialist; and other relevant factors).

 In the present case, the ALJ relied primarily on the
opinions of Dr. Lombardi, the testifying medical expert who
never examined the plaintiff, in finding that plaintiff had the
RFC to perform the full range of light work and chose not to
accord controlling weight to any of plaintiff's treating
physicians' opinions in the record. (Tr. 15.) The ALJ gave Dr.
Rovner's opinion "little weight" because (1) "the objective
medical evidence does not support the opinions related to
claimant's functional limitations and [the opinions] are
inconsistent with the substantial evidence of record," although
the ALJ did not provide specifics, and (2) plaintiff testified
that he could lift five pounds, contradicting Dr. Rovner's
statement that plaintiff could lift zero pounds. (*Id.* at 15.)

Dr. Rovner, a board-certified orthopedic surgeon, examined plaintiff every month from January to July 2010. Dr. Rovner diagnosed plaintiff with persistent cervical and lumbar discogenic radiculopathy and administered several epidural spinal injections to manage plaintiff's pain. In his July 5, 2010 report, Dr. Rovner opined that plaintiff could stand or walk for one to two hours and sit for one to three hours in an eight-hour workday; would be impaired in reaching, handling, pushing and pulling; could not lift any weight; and could not stoop, climb, kneel, balance, crouch or crawl.

Although the ALJ need not accept a treating physician's opinion as dispositive of the disability determination, he must reconcile the conflicting RFC determinations of the doctors in the record and explain his reasons for declining to credit the treating physician's opinion. 20 C.F.R. § 404.1527; *Gunter v. Comm'r of Soc. Sec.,* 361 Fed. App'x 197, 199 (2d Cir. 2010). The ALJ failed to reconcile the conflicting RFC determinations and failed to explain why he did not credit the opinions of plaintiff's treating physicians. Instead of analyzing the factors outlined in the SSA regulations in determining how much weight to give to Dr. Rovner's opinion, however, the ALJ made conclusory statements that the opinion was not supported by "objective medical evidence" or "substantial evidence of record."

Furthermore, the only conflicting evidence cited in the ALJ's decision to discredit Dr. Rovner's opinion[14] is plaintiff's testimony that he could lift five pounds at a time, which differs minimally with Dr. Rovner's assessment that plaintiff could not lift and/or carry any weight. Thus, the ALJ's failure to adequately explain his decision to reject the opinions of Dr. Rovner necessitates remand so that the ALJ can conduct the requisite analysis. *See Lopez-Tiru v. Astrue*, No. 09-CV-1638, 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011)

Neither did the ALJ provide sufficient explanation for rejecting the opinions of Dr. McGee, who treated plaintiff from February 2009 to January 2011, and Dr. Lattuga, a board-certified orthopedist who examined and conducted surgery on plaintiff in 2010 and 2011. The ALJ concluded that Dr. McGee's opinion also deserved little weight because (1) "issues of disability are reserved to the Commissioner" and (2) Dr. McGee did not specify how long plaintiff's pain would render him unable to return to work. (*Id.* at 15.) The ALJ correctly noted that Dr. McGee's opinions concerning plaintiff's disability are not determinative; rather, the ultimate determination of

---

[14] The ALJ did note separately that he accorded "great weight" to the opinion of non-examining medical expert Dr. Lombardi, who testified that plaintiff could lift 20 pounds and sit for six to eight hours in an eight-hour workday. (Tr. 15.) The ALJ, however, did not give any indication as to why he chose to assign great weight to Dr. Lombardi's opinion over any of plaintiff's treating physicians, other than to note that Dr. Lombardi adequately considered the evidence of record. (*Id.*) Therefore, it is unclear what evidence existed in the record to justify the ALJ's decision to give "little weight" to Dr. Rovner's opinion.

disability is reserved to the Commissioner. 20 C.F.R. §

404.1527(e)(1). Dr. McGee's medical records, however, include

much more than a bare statement of disability, and his opinions

as to the severity of plaintiff's impairments must be weighed

according to the factors set out in the SSA regulations if they

are not to be assigned controlling weight. The ALJ failed to

consider explicitly the extent of Dr. McGee's treating

relationship, his specialization or the support for and

consistency of his medical opinions with the record. This

omission by itself is grounds for a remand.[15] *See Halloran*, 362

F.3d at 33.

The ALJ similarly assigned limited weight to the

opinion of Dr. Lattuga after finding that "it [was] not

inconsistent with the overall evidence of record." The ALJ's

decision provides no explanation as to why consistency with the

record should warrant "limited weight." The ALJ failed to

supply good reasons, as established by the regulations and the

caselaw in this Circuit, and his analysis must be supplemented

on remand.

---

[15] Additionally, when the ALJ lacks information necessary to determine the weight or validity of medical evidence, it is his affirmative duty to develop the record in this regard. *See Schaal*, 134 F.3d at 505. To the extent the ALJ identified a lack of pertinent information about Dr. McGee's opinion, he had a duty to seek out that information before assigning "little weight" to the opinion as a whole.

The ALJ also noted that, although he was giving limited weight to Dr. Lattuga's opinions, the doctor "did not give specific impairments."  The ALJ, however, did not elaborate on how Dr. Lattuga's treatment of plaintiff factored into the determination of the weight given by the ALJ to Dr. Lattuga's opinion.  (Tr. 15.)  In any event, it is unclear what absence of impairments the ALJ refers to in the treatment records from Dr. Lattuga, as the doctor diagnosed plaintiff with cervical and lumbar spine sprain, radiculopathy and HNP.  (*Id.* at 344; *see id.* at 15.)  Furthermore, Dr. Lattuga ultimately deemed necessary and performed an anterior cervical discectomy and fusion surgery on plaintiff to "remove . . . damaged cervical or lumbar disk(s) [and] replace [them with] implants" in order to "stabilize [the] spine."  (*Id.* at 359-60.)  Thus, because Dr. Lattuga's records expressly detail specific physical impairments, the ALJ's statement does not appear to support his decision to accord Dr. Lattuga's opinion limited weight.

The Commissioner has also failed to explain whether and how he weighed the abundant and objective medical evidence in the record, including MRIs, discograms, x-rays and physical examinations by plaintiff's treating physicians, all of which established determinable physical impairments lasting for a continuous period of not less than twelve months.  The SSA regulations regarding evidence from treating physicians ensure

that plaintiff understands why the ALJ declines to give controlling weight to the findings and opinions of plaintiff's treating physicians. *See Snell*, 177 F.3d at 134 ("[the plaintiff] is not entitled to have [her treating physician's] opinion on the ultimate question of disability be treated as controlling, but she is entitled to be told why the Commissioner has decided—as under appropriate circumstances is his right—to disagree with [her treating physician]"); 20 CFR 404.1527(d)(2). Thus, for the reasons discussed above, the case must be remanded so that the ALJ can accord the appropriate weight to the opinions of plaintiff's treating physicians and, if the opinions are discounted, conduct the analysis required by 20 C.F.R. § 404.1527(d)(2) and the law in this Circuit to support his determinations.

B. <u>The ALJ's Failure to Weigh Evidence Supporting Plaintiff's Subjective Complaints of Pain Also Supports Remand</u>

In addition to the reasons warranting remand, as discussed above, the court finds that the ALJ erred by failing to weigh and discuss available evidence that likely would have influenced his decision to discredit plaintiff's allegations of pain and disability. While evaluating a plaintiff's testimony regarding his impairment and symptoms, the ALJ must take into account all relevant evidence. *Grace v. Astrue*, 2013 WL 4010271, at *20 (internal citations omitted); *see also Lugo v.*

*Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996) (finding ALJ erred by relying solely on evidence emphasizing plaintiff's health and ignoring evidence emphasizing plaintiff's frailty).

Pain alone is not determinative of disability but is a factor in combination with supporting medical evidence. *Lugo*, 932 F. Supp. at 505 (memorandum opinion and order on rehearing). When evaluating the intensity and persistence of a plaintiff's symptoms, the ALJ must determine whether the objective medical evidence supports the symptoms to the extent alleged. *Grace v. Astrue*, 2013 WL 4010271, at *21 (internal citations omitted). Objective medical evidence includes "evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2). If a plaintiff experiences a degree of pain greater than the objective medical evidence supports, the Commissioner will also consider the plaintiff's daily activities; the location, duration, frequency, and intensity of pain; the type, dosage, effectiveness and side effects of medication taken to alleviate pain; treatment other than medication; measures to relieve pain and other factors. 20 C.F.R. § 1529(c)(3).

The ALJ rejected plaintiff's claims "concerning the intensity, persistence, and limiting effects" of his symptoms as not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 16.) However, the ALJ's opinion fails to

41

mention plaintiff's scheduled surgery, multiple epidural injections, past prescriptions of pain medication, limited daily activities, and measures to relieve pain other than medication. It is therefore unclear whether the ALJ considered this evidence in his decision. Because the ALJ must explain how he reached his final credibility determination where there is conflicting evidence in the record, the case must be remanded. *See Lugo*, 932 F. Supp. at 503.

The ALJ's opinion further states that "[t]reatment notes in the record do not sustain claimant's allegations of disabling pain." (Tr. 16.) This statement is undermined, however, by objective medical evidence from treating physicians' notes, x-rays, MRIs, examinations and reports, which constitute the bulk of the administrative record. Specifically, Dr. Freeman reported in 2009 that plaintiff experienced reduced range of motion in his shoulder, neck, and back. (*Id.* at 227.) Dr. Rovner reported in 2010 that plaintiff displayed a limited range of motion of the cervical and lumbar spine, and spasm of the cervical and lumbar spine. (*Id.* at 222-23.) Other treating physicians' notes also support plaintiff's claims of pain. Dr. McGee consistently reported plaintiff's rating of pain as 8 or 9 on a scale of 10 and that plaintiff could not return to work due to disabling pain. Dr. Freeman, who examined plaintiff seven times from August to December 2009, noted that plaintiff

experienced pain and was disabled, and recommended at various points that he receive an MRI, refrain from working, undergo physical therapy, and see Dr. Aron Rovner about his spine. (*Id.* at 226-29, 233.) Dr. Berkowitz noted that conservative treatment was insufficient to relieve plaintiff of his pain symptoms. (*Id.* at 356.)

Other than the conclusory statements that plaintiff's allegations of pain and disability are not supported by the record and the ALJ's RFC determination, the ALJ's decision is silent as to why plaintiff's allegations are not credible. Thus, the court finds that remand is warranted to ensure that the ALJ considered and weighed the available evidence in the record, and that he explains his credibility determinations regarding plaintiff's subjective complaints of pain.[16]

C. The ALJ Must Consider the Evidence Submitted After the Hearing

Plaintiff argues that the ALJ could not have considered the evidence of plaintiff's need for surgery and his cervical disc fusion because the response submitted by Dr. Lombardi after he received plaintiff's post-hearing evidence was unsigned. (*See* Pl. Mem. at 19; Pl. Reply at 2-3.) Because the SSA regulations requiring a doctor's signature do not apply to

---

[16] Because the ALJ's failure to (1) provide good reasons for not giving plaintiff's treating physicians' opinions controlling weight necessitates remand and (2) explain his evaluation of plaintiff's subjective complaints of pain, the court does not reach the question of whether the ALJ's decision was supported by substantial evidence.

non-examining physicians, the ALJ did not violate the regulations when he relied on an unsigned follow-up response from Dr. Lombardi, a non-examining medical advisor. *See* 20 C.F.R. §§ 404.1519n; 416.919n ("The medical sources *who perform consultative examinations* will have a good understanding of our disability programs and their evidentiary requirements. . . . All consultative examination reports will be personally reviewed and signed by *the medical source who actually performed the examination*.") (emphasis added). The ALJ nevertheless has a duty to consider all the evidence before him and cannot rely on Dr. Lombardi's opinion of the additional evidence without confirming that Dr. Lombardi indeed reviewed the evidence and prepared the response letter.

Following the administrative hearing, and with the permission of the ALJ (*see* Tr. 177-78), plaintiff submitted additional evidence for inclusion in the record. (*Id.* at 357-64.) The ALJ forwarded this evidence, including a radiology report from Doshi Diagnostic dated January 26, 2011, treatment records indicating that plaintiff was to undergo surgery with Dr. Lattuga on May 11, 2011 and a medical report from Spine & Joint Services dated February 15, 2011, to Dr. Lombardi, who had testified at the administrative hearing that plaintiff had the RFC to perform light work. (*Id.*) The ALJ requested that Dr. Lombardi advise the ALJ as to whether Dr. Lombardi's testimony

would change after reviewing the new exhibits.  (*Id.* at 365.)

The ALJ included with the exhibits a form response letter with

the following contents:

> Date:
> [. . .]
> Re: Kyan L. Mullings
> SSN: [withheld]
>
> Dear Judge Wieselthier:
>
> I received the additional medical exhibit(s) on
> the above-named individual.  I have reviewed the
> evidence retained in my file in this matter and I
> recall the testimony given by me and upon the
> examination of the material submitted subsequent
> thereto, I find that in accordance therewith:
>
> ____ This evidence will change my testimony for
> the following reasons:
>
> ____ This evidence will not change my testimony.
>
> Sincerely yours,
>
> Louis J. Lombardi
> Medical Expert's Signature

(*Id.* at 366.)  The form letter was returned to the ALJ undated

and unsigned, with only a handwritten checkmark added next to

the statement "This evidence will not change my testimony."

(*Id.* at 367.)  In his decision, the ALJ noted that "Dr. Lombardi

also stated that evidence received after the hearing would not

change his testimony."

Plaintiff argues that this response letter is a report

under 20 C.F.R. §§ 404.1519n(e) and 416.919n(e), which require

that "[a]ll consultative examination reports . . . be personally

reviewed and signed by the medical source who actually performed the examination." (*See* Pl. Reply at 2-3.) If a report under Sections 404.1519n(e) and 416.919n(e) does not show clearly that a physician completed the report, the ALJ may not rely on the report. *See Dambrowski v. Astrue*, 590 F. Supp. 2d 579, 585 (S.D.N.Y. 2008) (declining to give any weight to a RFC assessment when it was unclear who completed it); *Amaker v. Apfel*, No. 98 CV 0762, 1999 WL 390694, at *1 (E.D.N.Y. Mar. 31, 1999) (Appeals Council remanded for legal error when ALJ relied in part on an unsigned consultative examination report).

Because Dr. Lombardi is a non-examining consultative source, however, the signature requirements for consultative examination reports generally do not apply. *See Genovese*, 2012 WL 4960355, at *19 (allowing the ALJ to rely on a non-examining psychiatrist's report in which the psychiatrist typed his signature); *Lackner*, 2011 WL 2470496, at *6 (no signature requirement for non-examining source's report on which she typed her name and the date).

Nonetheless, the importance of a signature is that it "attests to the fact that the medical source doing the examination or testing is solely responsible for the report contents and for the conclusions, explanations or comments provided[.]" 20 C.F.R. §§ 404.1519n(e), 416.919n(e). Unlike the cases cited above, Dr. Lombardi did not type his name in

lieu of a signature on his response; his name had already been typed on the letter, and the only change made to the pre-typed letter was a handwritten checkmark. As a result, the court is left to guess whether Dr. Lombardi in fact wrote the checkmark on the pre-typed letter and reviewed the additional evidence that plaintiff submitted. Therefore, even though a consultative non-examining source need not sign his or her reports by hand, the court respectfully directs the ALJ on remand to confirm that Dr. Lombardi received the letter, reviewed the additional evidence, recalled his testimony and would not change his testimony in light of the evidence.

## CONCLUSION

For the foregoing reasons, the court denies defendant's motion for judgment on the pleadings, denies plaintiff's motion insofar as it seeks remand solely for the calculation of benefits and remands this case for further proceedings consistent with this opinion. Upon remand, the ALJ should:

(1) Expressly set forth specific reasons for the weight given to plaintiff's treating physicians and develop the record as necessary to accord proper weight to medical opinions;

(2) Consider all evidence, including objective medical tests, examinations, x-rays, reports and MRIs probative of the intensity, persistence, and limiting effects of plaintiff's pain symptoms; and

(3) Obtain a response from Dr. Louis Lombardi that indicates that he recalled his hearing testimony, reviewed the additional evidence provided by plaintiff, and would not change his testimony in light of the evidence.

        The Clerk of the Court is respectfully requested to close the case.

**SO ORDERED.**

Dated:     Brooklyn, New York
            November 21, 2014


                              _____/s/_____
                              **KIYO A. MATSUMOTO**
                              United States District Judge
                              Eastern District of New York